David **SCHULTZ**, Plaintiff, Appellant,

v.

**YOUNG MEN'S CHRISTIAN ASSOCIATION OF THE UNITED STATES of America, Defendant, Appellee.**

No. 97–1524.

United States Court of Appeals, First Circuit.

Heard Nov. 4, 1997

Decided March 27, 1998.

---

Alan J. Rich with whom Farber & Rich LLP, New York City, Sarah S. Geer, Marc P. Charmatz, National Association of the Deaf Law Center, Silver Spring, MD, Paul F. Kelly and Segal, Roitman & Coleman, Boston, MA, were on brief, for appellant.

Thomas C. Federico with whom Lee Stephen MacPhee, Edward W. Murphy and Morrison, Mahoney & Miller, Boston, MA, were on brief, for appellee.

Before BOUDIN, Circuit Judge, COFFIN, Senior Circuit Judge, and DOWD;* Senior District Judge.

BOUDIN, Circuit Judge.

David Schultz brought suit in the district court against the Young Men's Christian Association of the United States of America ("the national YMCA") charging that it had discriminated against him because of his hearing disability. The district court granted summary judgment in favor of the national YMCA and Schultz now appeals. We affirm.

The background events are largely undisputed. Schultz is deaf unless he makes use of a hearing aid. He is also an accomplished swimmer and swimming instructor with many years' experience as a lifeguard; he obtained lifeguard certification from the American Red Cross in 1979. In 1993, Schultz was hired as the aquatics director for the Hockomock YMCA in North Attleboro, Massachusetts, an organization that is independent of the national YMCA.

In 1994, Schultz decided to seek lifeguard certification from the national YMCA. Such certification was neither required nor suggested by the Hockomock YMCA. Schultz took the necessary course from one of his own subordinates, Carol Wilson, who happened to have lifeguard certification from the national YMCA. When Schultz completed the course, Wilson concluded that he met all of the national YMCA criteria for certification except for a hearing requirement.

Among other criteria, the national YMCA requires for its certification that a lifeguard be able to hear noises and distress signals. Wilson asked Schultz for an audiologist's report, and Schultz furnished one saying that he would have no difficulty hearing sounds of normal intensity with his hearing aid in place. Assuming that Schultz would wear his hearing aid while lifeguarding, Wilson recommended that the national YMCA certify him, and it did so in early 1995.

* Of the Northern District of Ohio, sitting by designation.

Soon thereafter, Wilson noticed that Schultz did not always wear his hearing aid while lifeguarding and observed that Schultz was unable to hear noises without the hearing aid. Wilson was further concerned, she said, because she saw Schultz doing pool maintenance tasks while lifeguarding and turning his back on swimmers in the pool, including children. In mid–1995, Wilson asked the national YMCA to remove her name from Schultz's certification record because of the hearing requirement; the organization did so in July 1995, thereby revoking Schultz's certification.

Several weeks *before* this revocation, Schultz resigned as aquatics director and accepted a lower-paid position at the Hockomock YMCA. This change was due to evaluations of Schultz's job performance and was unrelated to his loss of national YMCA certification. Schultz later resigned from his new job but, so far as appears, Schultz continued to hold Red Cross lifeguard certification.

In December 1995, Schultz sued both the national YMCA and the Hockomock YMCA, setting forth a number of federal and state claims and seeking $20 million in damages as well as injunctive relief. However, Schultz confines his appeal solely to his claim for damages for emotional distress against the national YMCA under section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Its central provision reads, in pertinent part, as follows:

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

After extensive discovery, the national YMCA moved for summary judgment, primarily arguing that the ability to hear distress signals was a reasonable requirement for lifeguard certification. Schultz countered with evidence purporting to show that a deaf lifeguard was capable of performing lifeguard duties. At a pretrial conference, the court granted summary judgment in favor of the national YMCA, but *not* upon the main ground urged in the defendant's summary judgment motion.

Instead, the district court assumed—correctly, so far as we know—that the national YMCA did not cause Schultz to lose his job or otherwise cause him economic damages. Then, focusing upon the claim of emotional distress, the court said that it knew of no "precedent that supports the kind of emotional damages that is being asserted in relation to the cause of action in this setting." Alternatively, the court expressed doubt as to whether Schultz's own testimony as to emotional distress was an adequate basis for his damage claim.

Schultz has now appealed to this court, focusing upon the Rehabilitation Act and his claim for damages for emotional distress. By contrast, the national YMCA, while defending the district court's grounds of decision, also urges—as it is entitled to do, *Doe v. Anrig*, 728 F.2d 30, 32 (1st Cir.1984)—that the judgment is supported by Schultz's lack of qualification. Our review on the grant of the summary judgment is *de novo. Preferred Mut. Ins. Co. v. Travelers Cos.*, 127 F.3d 136, 137 (1st Cir.1997).

Section 504 of the Rehabilitation Act broadly prohibits discrimination on grounds of disability under "any program or activity receiving Federal financial assistance." The national YMCA concedes that its lifeguard certification program falls within this quoted language. Deafness makes Schultz an "individual with a disability" under the statute. 45 C.F.R. § 84.3(j). And the defendant has chosen not to contest the proposition that Schultz's certification was revoked "solely by reason of ... his disability."

Nevertheless, the "otherwise qualified" language of section 504 has been read, ungrammatically but persuasively, to mean that Schultz could not show a violation of the section if hearing was an essential function of lifeguarding and thus an appropriate requirement for lifeguard certification. *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 282 n. 7, 107 S.Ct. 1123, 1128 n. 7, 94 L.Ed.2d 307 (1987). Doubtless it is widely supposed that the ability to hear a distress call is a qualification for lifeguarding: one has in mind the dramatic picture of the child in a lake waving her arms and calling "help."

Whether the supposition is correct is a different question.

The disability statutes were meant to counter mistaken assumptions, no matter how dramatic or widespread. *Arline,* 480 U.S. at 279, 107 S.Ct. at 1126–27. And Schultz offered in opposition to summary judgment the detailed reports of two arguably expert witnesses to support his position that the ability to hear contributes little, if anything, to the performance of lifeguarding functions. It was probably this evidence, more potent than one might expect, that steered the district court to a different ground of decision.

One expert report was from Anita Marchitelli, who managed the aquatics program and the training of lifeguards at Gallaudet University. She had certified well over 400 deaf lifeguards for the Red Cross, which has no hearing requirement, and gave several pages of detailed explanations as to why deafness was not a handicap for a lifeguard. "In all of my 22 years in working with deaf individuals," she added, "I have never even heard [from extensive sources] of any incident or accident causing injury involving a deaf lifeguard."

The second opinion, provided by Frank Pia, a consultant on drowning accident causation, asserted that drowning victims are almost never in a position to call for help. Pia concluded: "I know of no scientific research, any documentation, anecdotal information or expert documentation that tends to show lifeguards who are deaf or who have a hearing loss are any higher risk than hearing people as pool lifeguards." Although somewhat more guarded than Marchitelli—Pia gave some attention to possible "reasonable accommodations" for the deaf lifeguard—Pia's report generally supported Schultz's position.

This evidence is only one side's version of the matter, and its experts have not been cross-examined. But in the face of these reports we are not certain that the safety issue could be resolved on summary judgment, at least on this record. Schultz also claimed that the national YMCA had made no serious effort to test or verify whether its "common sense" assumption was true. Were this a conventional employment discrimination case, in which Schultz had been denied a lifeguard job because of deafness, he might have enough to reach a jury.

Of course, in granting certifications the national YMCA is not hiring employees, nor does it appear that its certification is either a legal or a practical condition for obtaining work as a lifeguard. The national YMCA has simply announced criteria that it thinks appropriate for a lifeguard and offered certification to those who meet its qualifications. One might even think that there are free-speech interests at stake or that, at the very least, there should be greater latitude for a certifying organization to make judgments about its endorsement than where employment is being offered, withheld, or substantially affected.

On the other hand, by choosing to seek federal funds for its program, the national YMCA has subjected itself to section 504's rather broadly framed obligation not to discriminate against the disabled. Whether its requirements in granting certification must be fully correct, and not merely colorable, is a difficult question. It has not been briefed here or decided elsewhere. We will thus assume *arguendo* that at trial its ability-to-hear criterion might be shown to constitute impermissible discrimination, whatever that showing might entail.

This brings us to the district court's actual grounds of decision. We start with the question whether there was evidence of emotional damage or, to put the matter technically, whether Schultz had proffered evidence in a form adequate under the federal and local rules to present an issue for a jury to consider. To support his claim, Schultz points to his own deposition testimony of emotional distress and to a therapist's report indicating that he suffered depression and anxiety in connection with his loss of certification.

■ Schultz's own deposition testimony was obviously competent under the formal requirements of Fed.R.Civ.P. 56(e). The more dramatic and detailed version of harm provided by the therapist's letter was not properly before the court because the report was not in affidavit form under Rule 56(e) and was not appended to Schultz's opposition to the motion for summary judgment as re-

quired by local rules. D. Mass. R. 56.1. Yet, without the report from the therapist, Schultz's own testimony would likely be evidence enough of emotional damage to avoid summary judgment, even if a jury might find it self-serving or not worth a significant award.

In addition, the summary judgment motion did not, in our view, give fair warning that the national YMCA was seeking summary judgment for lack of proof of damage. *See Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir.1993). While the district judge was entitled to raise the issue himself at oral argument, it would be harsh to insist that the plaintiff then and there go beyond an informal proffer—here, supported by the therapist's letter—when Schultz had no prior notice that a formal opposition to summary judgment was required on the issue.

■ The district court's main ground of decision was that damages solely for emotional injury would be inappropriate in this case. The problem is complicated because the Rehabilitation Act does not itself contain any express remedy for section 504 violations. It does incorporate the remedies provided under Title VI of the Civil Rights Act—but Title VI's only express remedy is a cutoff of federal funding to the affected program. 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 2000d–1. Nevertheless, by judicial construction a private cause of action for injunctive relief and damages now exists under section 504, qualified by the general assertion that the remedy must be "appropriate." *See Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).[1]

Whether damages can be awarded for emotional injury is, at least nominally, a closer question, because the Supreme Court has not spoken directly on this point, and the case law reflects a split of authority. Burgdorf, *Disability Discrimination in Employment Law* 554–55 (1995) (collecting cases). Nevertheless, *Franklin* was written with considerable breadth, and as a matter of

prediction, it may be a fair guess—we need not rule—that the Supreme Court might well allow damages for emotional distress under section 504 in some circumstances. Whether this case is "appropriate" for such an award is a much closer question.

Along with its pleasures, life involves many unintended slights and embarrassments. We have no reason to doubt that Schultz felt deeply hurt by what he took to be a reflection on his ability to perform his vocation. But traditionally the courts have rarely permitted recovery solely for unintended emotional distress without any attendant physical or economic damage; on the contrary, such recovery has usually been limited to cases of egregious behavior presenting a high likelihood of substantial mental injury. *See Restatement (Second), Torts* § 436A and comment b (1965); W. Keeton, *Prosser and Keeton on Torts* § 54, at 361–62 (5th Cir.1984).

This limitation is only one of a number of court-crafted doctrines, seeking to assure that damage remedies do not get completely out of hand. Other examples include concepts of proximate cause in tort law, *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928); standing limitations, *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746, 97 S.Ct. 2061, 2074–75, 52 L.Ed.2d 707 (1977); and restrictions under maritime law on economic damages, *Barber Lines A/S v. M/V Donau Maru,* 764 F.2d 50, 51–52 (1st Cir. 1985). Here, the Supreme Court's reference in *Franklin* to "appropriate" remedies makes us all the more cautious in exceeding the bounds of past practice.

In this case, Schultz has made no claim that he has suffered any direct economic loss, either from the national YMCA's standards or from withdrawal of his certification. Nor has he suggested that certification is either in legal or practical terms a condition of obtaining lifeguard employment. *Compare Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). He says only that he is

---

1. *Franklin* itself involved not section 504 but another provision with a wording similar (for our purpose) to section 504. The result is that since *Franklin,* the courts addressing the issue

have held that similar relief is available under section 504. *E.g., Moreno v. Consolidated Rail Corp.,* 99 F.3d 782, 784 (6th Cir.1996) (en banc).

entitled to several million dollars for emotional distress because under the national YMCA's standards, he is not entitled to certification.

Schultz's position is very little different from that of any deaf lifeguard who could claim at large to be offended or distressed by what may be an over-rigid criterion adopted by one certifying organization (the national YMCA) but not by others (*e.g.*, the Red Cross). It happens that Schultz did obtain certification and later had it withdrawn. But certification was obtained, and then lost, based upon Schultz's indirect representation that he would wear a hearing aid. Otherwise, Schultz remains someone who simply does not meet the national YMCA criteria.

There is not the slightest hint that the national YMCA was prompted by malice or hostility toward him or toward the disabled. On the contrary, whether or not it erred in its judgment, its concerns—for the safety of swimmers and the reliability of its endorsement—were legitimate. This is not a case where damages for emotional distress can be justified to punish patent misbehavior or the deliberate infliction of humiliation.[2]

We do not hold that damages for emotional injury are precluded in all cases under section 504. The situation might be different if there were some sign of actual animus toward the disabled; to call the defendant's action "intentional," as Schultz does, is hardly the same thing. A claim for injunctive relief to secure certification might also have been available if Schultz had chosen to pursue it, instead of narrowing his action into a test case for damages.

The Rehabilitation Act, like similar federal and state disability statutes, deserves sympathetic enforcement by the courts. But, as in all things, a balance must be struck. The national YMCA's standards are not automatically immune simply because they were adopted in good faith or based on widespread assumptions. But an award of damages for emotional distress, in a debatable case on the

merits with no animus or other concrete impact, strikes us as a distortion of remedial relief.

*Affirmed.*

---

**2.** A good comparison is with civil rights cases allowing emotional distress damages in certain circumstances for unlawful racial discrimination where the conduct was plainly unlawful (*e.g.*, racially motivated denial of jobs or housing or public accommodations), flagrantly humiliating, or both. *E.g., Johnson v. Hale,* 940 F.2d 1192 (9th Cir.1991); *Smith v. Sol D. Adler Realty Co.,* 436 F.2d 344 (7th Cir.1970).