RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0011p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

NICHOLAS A. KEITH,

     *Plaintiff-Appellant,*

    *v.*

COUNTY OF OAKLAND,

     *Defendant-Appellee.*

No. 11-2276

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-12026—Lawrence P. Zatkoff, District Judge.

Argued: October 10, 2012

Decided and Filed:  January 10, 2013

Before:  SUTTON, GRIFFIN, and WHITE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Donald M. Fulkerson, Westland, Michigan, for Appellant.  John J. Lynch, VANDEVEER GARZIA, P.C., Troy, Michigan, for Appellee.  **ON BRIEF:** Donald M. Fulkerson, Westland, Michigan, Joey S. Niskar, Bingham Farms, Michigan, for Appellant.  John J. Lynch, Christian E. Hildebrandt, VANDEVEER GARZIA, P.C., Troy, Michigan, Keith J. Lerminiaux, OAKLAND COUNTY CORPORATE COUNSEL, Pontiac, Michigan, for Appellee.

_____

**OPINION**

_____

    GRIFFIN, Circuit Judge.  Plaintiff Nicholas Keith, a deaf individual, filed the instant action alleging that defendant Oakland County discriminated against him on the basis of disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, *et seq.*, when it failed to hire him as a lifeguard.  The district court

1

granted Oakland County's motion for summary judgment. For the reasons that follow, we hold that genuine issues of material fact exist regarding whether Keith is otherwise qualified to be a lifeguard at Oakland County's wave pool, with or without reasonable accommodation. Accordingly, we reverse the district court's judgment and remand for further proceedings consistent with this opinion.

I.

Keith has been deaf since his birth in 1980. When wearing an external sound transmitter, he can detect noises through his cochlear implant, such as alarms, whistles, and people calling for him. Because he is unable to speak verbally, he communicates using American Sign Language ("ASL").

In 2006, Keith enrolled in Oakland County's junior lifeguard training course. Oakland County provided an ASL interpreter to relay verbal instructions to him. The interpreter did not assist Keith in executing lifesaving tasks. Keith successfully completed the course.

In 2007, Keith enrolled in Oakland County's lifeguard training program. Candidates must pass a basic swim test to participate in the training. During training, candidates are taught how to enter the water, scan the water for distressed swimmers, execute basic saves, respond to spinal injuries, and perform CPR. With the assistance of an ASL interpreter to communicate verbal instructions, Keith successfully completed the training.

Having received his lifeguard certification, Keith applied for a lifeguard position at Oakland County's wave pool. The job announcement required applicants to be at least sixteen years old and pass Oakland County's water safety test and lifeguard training program. The application also contained the following condition of employment: "All persons hired by Oakland County must take and pass a medical examination from a county-appointed physician, at no cost to the applicant."

Katherine Stavale is Oakland County's recreation specialist. She contacted her supervisors to ask if she could offer Keith the position. She explained that Keith had

requested an ASL interpreter to be present at staff meetings and further classroom instruction. Having received no objection, Stavale extended Keith an offer of employment, conditioned upon a pre-employment physical. In an email, Stavale told Keith, "you passed training and you did a good job, so we would like to offer you a part-time position as a lifeguard." Stavale asked him to contact her to set up a meeting to complete his paperwork and schedule his orientation sessions.

Shortly thereafter, Keith was examined by Dr. Paul Work, D.O. When Dr. Work entered the examination room, he looked at Keith's medical history and stated, "He's deaf; he can't be a lifeguard." Keith's mother asked Dr. Work, "Are you telling me you're going to fail him because he's deaf?" Dr. Work responded, "Well, I have to. I have a house and three sons to think about. If something happens, they're not going to sue you, they're not going to sue the county, they're going to come after me."

In his report, Dr. Work described Keith as "physically sound except for his deafness." Dr. Work did not believe that Keith could function independently as a lifeguard, but he thought that he could be a valuable member of a team if properly integrated and monitored. Dr. Work approved Keith's employment as a lifeguard if his deafness was "*constantly* accommodated." However, he did not say whether Keith could, in fact, be safely accommodated, and he expressed doubt that accommodation would always be adequate.

Having learned the results of the physical, Stavale placed Keith's employment on hold and contacted Wayne Crokus, the client manager at Ellis & Associates. Ellis is a group of aquatic safety and risk management consultants that provides guidance to Oakland County regarding its water park facilities and lifeguard training program. Oakland County follows Ellis's methodologies to train and test candidates for its lifeguard openings, but Ellis is not directly involved in the certification and employment of Oakland County's lifeguards. Oakland County is responsible for licensing and hiring its lifeguards.

Stavale told Crokus that she had trained and hired as a lifeguard a profoundly deaf individual. In response, Crokus expressed concern about whether a deaf individual

could perform effectively as a lifeguard. He suggested to Stavale that a job-task analysis be done to determine whether Keith could perform the job with or without accommodation. Crokus has a background in aquatic safety and lifeguard training, but he has no education or experience regarding the ability of deaf people to work as lifeguards, and he did not conduct any research into the issue upon learning about Keith. He never communicated with Keith, never observed Keith during training, and never spoke with Dr. Work.

Stavale also corresponded with Richard Carroll, Ellis's senior vice president. Carroll suggested that Stavale find out the type of hearing device that Keith used and assess his ability to detect a distressed swimmer. He suggested that Stavale determine, under the standards used for all candidates, whether Keith could perform in the actual work environment at the level outlined in the job description, but he could not provide a definitive answer without a familiarity with Keith or the facility. Like Crokus, Carroll has no education, training, or experience regarding the ability of deaf people to work as lifeguards, and he did not research the issue. At the time of his response, Carroll had visited Oakland County's wave pool once during the off season.

After these discussions, Stavale prepared a six-page outline setting forth the accommodations that she believed could successfully integrate Keith, and she sent it to Crokus for feedback. Stavale explained:

1.    Keith will carry laminated note cards in the pocket of his swim trunks to communicate with guests in non-emergency situations.

2.    Keith does not need to hear to recognize and rescue a distressed swimmer; experience reveals that distressed swimmers do not cry out for help.

3.    Keith will use his whistle and shake his head "no" to enforce pool rules.

4.    Keith will briefly look at other lifeguards on duty when scanning his zone to see if they enter the pool for a save.

5.    Because Keith cannot use the megaphone or radio, another lifeguard will have this responsibility when Keith is working.

6.    Keith will not work the slide rotation, which should not be a problem because this is one of the favorite rotations and many lifeguards like to work more than one slide rotation.

7.    The Emergency Action Plan ("EAP") will be modified, regardless of whether Keith is scheduled. To initiate the EAP, lifeguards will be required to signal with a fist in the air, opening and closing it like a siren. This will accommodate Keith and improve the effectiveness of the EAP for the entire team.

Crokus questioned Stavale on several of these accommodations and remained concerned about Keith's ability to function effectively as a lifeguard. He stated, "without 100 percent certainty that [the proposed accommodations] would always be effective, I don't think you could safely have [Keith] on the stand by himself." Ultimately, Stavale and her supervisors decided to revoke the offer of employment.

In 2008, Keith applied for another lifeguard opening, as well as a park attendant opening. He was not hired for either position. According to Oakland County, Keith was disqualified from consideration as a lifeguard based on his pre-employment physical in 2007, and his application for the park attendant position was not selected in the "blind draw process." This appeal pertains only to the lifeguard position.

Keith filed a complaint in the district court alleging violations of the ADA and the Rehabilitation Act. Oakland County moved for summary judgment, arguing that Keith is not "otherwise qualified" to be a lifeguard at its wave pool because he cannot effectively communicate with other lifeguards, patrons, emergency personnel, and injured persons. Further, Oakland County argued that hiring an additional lifeguard as an interpreter is an unreasonable accommodation.

Keith responded that he is "otherwise qualified" for the position and Oakland County revoked the offer of employment based on unfounded fear and speculation. According to Keith, he would require an interpreter only during staff meetings and further classroom instruction, which he argued is a reasonable accommodation. Keith also complained that Oakland County failed to make an individualized inquiry regarding

his ability to perform the job or engage in an interactive process to determine whether he could be reasonably accommodated.

As evidence of his qualifications for the position, Keith provided the testimony of several experts. Anita Marchitelli has worked with deaf people in the area of lifeguarding and aquatics for more than thirty years. She is a certified lifeguard training instructor with the American Red Cross in the areas of lifeguarding, water safety, and CPR. She is also an associate professor in the physical education and recreation department at Gallaudet University, the only liberal arts university in the world dedicated to serving the needs of deaf individuals. She has certified more than 1,000 deaf lifeguards through the American Red Cross programs. According to Marchitelli, there have been no reported incidents of drowning or near drowning of any individuals over whom a deaf lifeguard was responsible. It is her professional opinion that the ability to hear is unnecessary to enable a person to perform the essential functions of a lifeguard. In her affidavit, Marchitelli notes that the world record for most lives saved is held by a deaf man, Leroy Colombo, who saved over 900 lives in his lifeguarding career.

Sheri Garnand is a deaf lifeguard certified by the American Red Cross. It is her professional opinion that the ability to hear is unnecessary to enable a person to perform the essential functions of a lifeguard. According to Garnand, distressed swimmers exhibit visual signs of distress, which a deaf person scanning his or her assigned area can detect. She believes that deaf lifeguards do not require accommodation to perform the essential functions of a lifeguard; in her opinion, an ASL interpreter is unnecessary.

Dr. Colleen Noble is a physician specializing in pediatric neurodevelopmental disabilities and has worked with hearing impaired individuals for over thirty years. It is Dr. Noble's opinion that deaf individuals have the potential to be excellent lifeguards. She stated that, in a noisy swimming area, recognizing a potential problem is almost completely visually based. Further, she said that individuals who become deaf before age three have better peripheral vision than hearing individuals. It is her opinion that Keith meets the criteria to become a lifeguard and his deafness should neither disqualify him nor require constant accommodation.

Addressing Oakland County's motion for summary judgment, the district court first concluded that Dr. Work failed to make an individualized inquiry regarding whether Keith's disability disqualified him from working as a lifeguard at Oakland County's wave pool.  Nonetheless, the court determined that Oakland County, the ultimate decision-maker, made an individualized inquiry regarding Keith's abilities.  The district court also determined that Keith failed to show that he could perform the essential communication functions of a lifeguard with or without reasonable accommodation.  As such, the district court reasoned that any failure by Oakland County to engage in the interactive process regarding whether Keith could be accommodated did not establish a violation of the ADA.  Accordingly, it granted summary judgment in favor of Oakland County.  In this appeal, Keith argues that the district court erred when it concluded as a matter of law that (1) Oakland County made an individualized inquiry regarding Keith's abilities; (2) he is unqualified to be a lifeguard at Oakland County's wave pool; (3) accommodating Keith would be unreasonable; and (4) any failure to engage in the interactive process was inconsequential because no reasonable accommodation was possible.

## II.

We review de novo a district court's grant of summary judgment.  *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "We consider all facts and inferences drawn therefrom in the light most favorable to the nonmovant."  *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001).  Claims brought under the Rehabilitation Act are reviewed under the same standards that govern ADA claims.  *See Holiday v. City of Chattanooga*, 206 F.3d 637, 642 n.1 (6th Cir. 2000).

## III.

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  The ADA defines "discriminate" to include the failure to provide reasonable accommodation to an

otherwise qualified individual with a disability, unless doing so would impose an undue hardship on the employer's business. *Id*. § 12112(b)(5). To establish a prima facie case, a plaintiff must show that he is disabled and otherwise qualified for the position, either with or without reasonable accommodation. *Kiphart v. Saturn Corp.*, 251 F.3d 573, 581 (6th Cir. 2001). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to show that accommodating the plaintiff would impose an undue hardship on the operation of its business. *Id.*

The parties do not dispute that Keith is disabled within the meaning of the ADA or that Oakland County rescinded the offer of employment because of his disability. The issues in dispute are whether Oakland County made an individualized inquiry, whether Keith is otherwise qualified for the position in question with or without reasonable accommodation, and whether Oakland County engaged in the interactive process.

## A. Individualized Inquiry

As a threshold matter, "[t]he ADA mandates an individualized inquiry in determining whether an [applicant's] disability or other condition disqualifies him from a particular position." *Holiday*, 206 F.3d at 643. A proper evaluation involves consideration of the applicant's personal characteristics, his actual medical condition, and the effect, if any, the condition may have on his ability to perform the job in question. *Id.* This follows from the ADA's underlying objective: "people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged on the relevant medical evidence and the abilities they have." *Id.* (internal quotations omitted). The ADA requires employers to act, not based on stereotypes and generalizations about a disability, but based on the actual disability and the effect that disability has on the particular individual's ability to perform the job. *Id.*

The district court properly determined that Dr. Work failed to make an individualized inquiry. After Dr. Work entered the examination room and briefly reviewed Keith's file, he declared, "He's deaf; he can't be a lifeguard." Dr. Work made no effort to determine whether, despite his deafness, Keith could nonetheless perform

the essential functions of the position, either with or without reasonable accommodation. Indeed, Dr. Work has no education, training, or experience in assessing the ability of deaf individuals to work as lifeguards. Dr. Work's cursory medical examination is precisely the type that the ADA was designed to prohibit. *See, e.g.*, *Holiday*, 206 F.3d at 644 (reasoning that questions of fact remained regarding whether the physician disqualified the plaintiff from being a police officer based on his HIV status rather than investigating whether having HIV actually impeded his ability to withstand the rigors of police work).

In addition, although not addressed by the district court, we question whether Ellis, through its representatives, made an individualized inquiry regarding Keith's ability to perform the job. Ellis's representatives never spoke with Dr. Work, they never met Keith, and they never allowed Keith an opportunity to demonstrate his abilities. Although knowledgeable in aquatic safety, they have no education, training, or experience regarding the ability of deaf individuals to work as lifeguards. Indeed, the representatives testified that they could not provide an opinion regarding Keith's ability to perform the essential functions of the position without seeing him in the actual work environment with the proposed accommodations in place. It is also concerning that, when corresponding with Stavale about ways to incorporate Keith into the lifeguard team, an Ellis representative asked whether Keith would be able to perform perfectly "100 percent of the time." As Stavale acknowledged, that is an impossible standard to expect of any lifeguard. Individuals with disabilities cannot be held to a higher standard of performance than non-disabled individuals. *See* 42 U.S.C. § 12112(b)(3)(A) (prohibiting employers from "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability").

Nonetheless, the district court concluded that Oakland County, the ultimate decision-maker, made an individualized inquiry. We do not disagree with this conclusion. Keith's abilities were observed during lifeguard training, accommodations were proposed to integrate Keith into the lifeguard team, and both staff and management were on board with the plan to hire Keith. That being the case, we question what

changed?  Did Oakland County alter its assessment based on Dr. Work's report and the advice of Ellis's representatives?  If so, did Oakland County's individualized inquiry satisfy the ADA's mandate?  Because it strikes us as incongruent with the underlying objective of the ADA for an employer to make an individualized inquiry only to defer to the opinions and advice of those who have not, we direct the district court to consider these questions on remand.  *See Holiday*, 206 F.3d at 645 (reasoning that employers cannot escape liability under the ADA merely by mechanically relying on the medical opinions and advice of third parties).

## B.  "Otherwise Qualified"

Whether the ability to hear is an essential function of a lifeguard position has not been addressed by this court and, as far as we can tell, no court has squarely addressed it.  Some insight is found in *Schultz v. YMCA*, 139 F.3d 286 (1st Cir. 1998), a case involving a deaf individual's claim for emotional distress damages under the Rehabilitation Act.  In *Schultz*, the YMCA revoked the plaintiff's lifeguard certification for failure to satisfy its certification requirement that lifeguards be able to hear noises and distress signals.  *Id*. at 287–88.

The court explained that "[t]he disability statutes were meant to counter mistaken assumptions, no matter how dramatic or widespread."  *Id*. at 289.  Thus, according to the court, despite the prevailing view that the ability to hear a distress call is a requirement for a lifeguard, "[w]hether the supposition is correct is a different question."  *Id*. at 289.  In light of the opinions of the plaintiff's experts that "the ability to hear contributes little, if anything, to the performance of lifeguarding functions,"[1] the court expressed uncertainty about whether the assumption on which the hearing requirement was based had any support in fact.  *Id*. at 289.  Indeed, the court thought that the plaintiff "might have enough to reach a jury" in a conventional employment discrimination claim had he been denied a lifeguard position on account of his deafness, as here.  *Id*.  But by merely granting certifications, the YMCA was not hiring employees or establishing conditions

---

[1]One of the experts in *Schultz* is Anita Marchitelli, who has offered an affidavit in this case.

for obtaining work as a lifeguard. *Id.* And although the YMCA, as the recipient of federal funds, was obligated under the Rehabilitation Act not to discriminate on the basis of disability, the court considered it "a difficult question" whether the YMCA's requirements for certification must be "fully correct, and not merely colorable." *Id.* Ultimately, assuming *arguendo* that a hearing requirement for lifeguards might constitute unlawful discrimination, the court affirmed the district court's grant of summary judgment in favor of the YMCA because the circumstances of the case did not justify an award of emotional distress damages. *Id.* at 291. Thus, although suggesting how it might rule in a case such as this, the suggestion is merely dicta.

Without any authority directly on point, we turn to the statutory text and accompanying regulations for guidance on the issue whether a deaf individual may be considered "otherwise qualified" for lifeguarding within the meaning of the ADA. We begin with the language of the statute itself. *Walton v. Hammons*, 192 F.3d 590, 593–94 (6th Cir. 1999). We may also rely on the regulations interpreting the ADA, which we assume are valid unless contested. *Knapp v. City of Columbus*, 192 F. App'x 323, 328 (6th Cir. 2006).

As defined in the statute, an individual is "otherwise qualified" if he or she can perform the "essential functions" of the job with or without reasonable accommodation. 42 U.S.C. § 12111(8). The ADA instructs, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.* According to the regulations, "essential functions" refer to job duties that are "fundamental" rather than "marginal." 29 C.F.R. § 1630.2(n)(1). A job function may be considered essential because: (1) the position exists to perform that function; (2) there are a limited number of employees available among whom the performance of that job function can be distributed; or (3) the function is highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function. *Id.* § 1630.2(n)(2). Factors to consider when determining whether

a job function is essential to the position include: (1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs. *Id*. § 1630.2(n)(3). Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment. *Kiphart*, 251 F.3d at 585.

In this case, Stavale testified regarding the need for lifeguards to effectively communicate while on the job. As Oakland County's representative, her judgment is entitled to deference. Further, the job announcement indicates that summer lifeguards are required to supervise water activities, enforce safety rules, maintain water areas, and teach swim lessons. To the extent that these job duties necessarily require communication, the description provides evidence that communicating is an essential function of being a lifeguard at Oakland County's wave pool. For the purposes of our analysis, this much can be presumed.

With regard to supervising water activities and lifesaving, Keith has presented evidence from which a jury could reasonably find that he can communicate effectively despite his deafness. Like other lifeguards, Keith can adhere to the "10/20 standard of zone protection," a scanning technique taught to lifeguards in which they must scan their entire zone every ten seconds and be able to reach any part of their zone within twenty seconds. This method is purely visual. Further, by passing Oakland County's lifeguard training program and earning his lifeguard certification, Keith demonstrated his ability to detect distressed swimmers, which several experts testified is almost completely visually based.

In addition to communicating with distressed swimmers, there is evidence that Keith can effectively communicate with other lifeguards during lifesaving. Because he cannot hear another lifeguard's whistle blow before going in for a save, as a modest modification, he could briefly look at the other lifeguards when scanning his zone.

Likewise, Keith has presented evidence that he can enforce safety rules. Verbal enforcement is usually impractical in a noisy water park, and most lifeguards rely on their whistle and various physical gestures, including shaking their head "no" for patrons to stop engaging in horseplay, motioning their hand backward for a patron to get behind the red line, and signaling the number one with their finger for "one person per tube." Keith can use these same methods of enforcement.

Keith has also presented evidence that he can communicate effectively during emergencies with a modification to the EAP. To activate the EAP, lifeguards would signal with a fist in the air, opening and closing their fist in repetition. According to Stavale, this would improve the EAP for everyone, not just Keith. It would allow other lifeguards and staff to see the EAP visually if they are not in a position to hear it. Once activated, other lifeguards who are required to maintain their position would put their fist in the air and make the same signal.

Further, Keith has presented evidence that he can respond to patrons who approach him, at least at a level that may be considered *essential* for a lifeguard. He would carry a few laminated note cards in the pocket of his swim trunks with basic phrases such as, "I am deaf. I will get someone to assist you. Wait here." He can also provide first aid in situations in which he can see the ailment requiring attention. Although there may be situations in which verbal communication is necessary, attendants are posted throughout the water park to assist patrons with basic needs and inquiries, suggesting that this is not an essential function of lifeguards, or at least reasonable minds could differ on this point. In addition, staff members are required to respond whenever a whistle is blown to signal a save.

Perhaps the most compelling evidence that Keith is "otherwise qualified" comes from his experts who have knowledge, education, and experience regarding the ability of deaf individuals to serve as lifeguards. They all opine that the ability to hear is unnecessary to enable a person to perform the essential functions of a lifeguard. The world record for most lives saved is held by a deaf man, Leroy Colombo, who saved over 900 lives in his lifeguarding career. One also cannot ignore that the American Red

Cross certifies deaf lifeguards, and Gallaudet University, the only liberal arts university in the world dedicated to serving the needs of deaf individuals, has a lifeguard certification program.

In light of this evidence, we hold that reasonable minds could differ regarding whether Keith is "otherwise qualified" because he can perform the essential communication functions of a lifeguard. The district court erred when it decided that Keith's deafness disqualified him from the position as a matter of law.

### C.  "With or Without Reasonable Accommodation"

When accommodation is necessary to enable a plaintiff to perform the essential functions of the position in question, it is the plaintiff's burden to propose an accommodation that is "objectively reasonable." *Kleiber*, 485 F.3d at 870. In defining what is reasonable, this court "has described the employee's initial burden on this issue as showing 'that the accommodation is reasonable in the sense both of efficacious and of proportional to costs.'" *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996) (quoting *Vande Zande v. State of Wisconsin Dep't of Admin.*, 44 F.3d 538, 543 (7th Cir. 1995)). The employer can then "escape liability if he can carry the burden of proving that a disability accommodation reasonable for a normal employer would break him." *Vande Zande*, 44 F.3d at 543. As stated by other circuits, the reasonable accommodation inquiry asks whether an accommodation "is reasonable in the run of cases, whereas the undue hardship inquiry focuses on the hardships imposed by the plaintiff's preferred accommodation in the context of the particular [employer's] operations." *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993); *accord Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir. 1996). The reasonableness of a requested accommodation is generally a question of fact. *Haschmann v. Time Warner Ent. Co., L.P.*, 151 F.3d 591, 601 (7th Cir. 1998).

Keith argues the modifications to Oakland County's policies, as outlined above, are objectively reasonable. There is evidence that such modifications would allow Keith to effectively communicate while on duty (*i.e.*, the accommodation is efficacious) at little or no cost to Oakland County (*i.e.*, the accommodation is proportional to costs).

Oakland County raises the valid concern that other employees may have to shoulder extra duties because of Keith's disability, such as following through with certain patron inquiries or first aid needs. But this does not, standing alone, entitle Oakland County to summary judgment. The ADA includes "job restructuring" among its enumeration of reasonable accommodations. 42 U.S.C. § 12111(9)(B). And although the ADA does not require the shifting of *essential* functions, the ADA "require[s] an employer to restructure the marginal functions of a job as a reasonable accommodation." *Holbrook v. City of Alpharetta*, 911 F. Supp. 1524, 1542 (N.D. Ga. 1995); *see also Benson v. Northwest Airlines,* 62 F.3d 1108, 1112 (8th Cir. 1995) (stating that reasonable accommodation may "involv[e] reallocating the marginal functions of a job").

The district court's reliance on *Bratten v. SSI Servs., Inc*., 185 F.3d 625, 632 (6th Cir. 1999), is misplaced. The plaintiff in *Bratten* was an automotive mechanic, an essential function of which was to perform lifting tasks. *Id*. at 632. Accommodating the plaintiff would have required other employees to perform as much as twenty percent of the plaintiff's lifting duties, which the court sensibly indicated would be unreasonable. *Id*. at 632–33. In this case, however, Keith presented evidence that he can perform the *essential* communication duties of a lifeguard (e.g., detecting and rescuing distressed swimmers, enforcing pool rules, activating the EAP, performing CPR) through modifications that do not require shifting responsibility onto other lifeguards. *See Benson*, 62 F.3d at 1112. Further, there is no suggestion that the proposed shift in responsibilities would even approach the extent of reallocation in *Bratten*. Viewing the evidence in the light most favorable to Keith, a reasonable jury could find that the proposed modifications to Oakland County's policies are objectively reasonable.

Keith also presented evidence that providing an interpreter during staff meetings and further classroom instruction is objectively reasonable.[2] His successful completion

---

[2] Keith did not request an interpreter while on duty, and several experts testified that an interpreter is unnecessary to enable a deaf individual to perform the essential functions of a lifeguard. The suggestion by the district court and Oakland County that Keith would require an interpreter during his entire shift seems to be based on the opinions of Dr. Work and the representatives at Ellis, none of whom apparently have direct knowledge, education, or experience regarding the ability of deaf individuals to work as lifeguards.

of Oakland County's junior lifeguard and lifeguard training courses demonstrates that providing an ASL interpreter is efficacious during classroom instruction and similar settings, and considering that he would require an interpreter only on occasion and could function independently while on duty, the benefit of the interpreter would appear to be proportional to costs.

Moreover, the ADA provides that "reasonable accommodation" may include "the provision of qualified readers or interpreters." 42 U.S.C. § 12111(9). The inclusion of interpreters among the list of enumerated reasonable accommodations suggests to us that the provision of an interpreter will often be reasonable, particularly when the interpreter is needed only on occasion, in this instance, just for staff meetings and training. In fact, there are numerous cases in which courts have found that the provision of an interpreter during staff meetings and training sessions presented a question of fact for the jury on the issue of reasonableness. *E.g.*, *EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1111–13 (9th Cir. 2010) (question of fact remained regarding whether the employer failed to provide the deaf plaintiff a reasonable accommodation because it did not provide him with a sign language interpreter for certain staff meetings, disciplinary sessions, and training); *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 364–70 (4th Cir. 2008) (jury found by a preponderance of the evidence that FedEx violated the ADA by denying the deaf plaintiff's requests for an ASL interpreter during meetings, training, and other events); *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1246 (10th Cir. 1999) (the deaf plaintiff established a prima facie case where he showed that the employer refused to provide an interpreter at staff meetings and training sessions).

In our view, the district court should not have relied on *Steward v. Daimler Chrysler Corp.*, 533 F. Supp. 2d 717 (E.D. Mich 2008). *Steward* involved an assembly line worker who requested an assistant to accommodate her carpal tunnel syndrome. *Id.* at 720–22. The court held that such an accommodation was unreasonable because it was "equal to eliminating an essential function of the job." *Id.* at 722. Here, however, Keith has not asked for an assistant while on duty, and providing an interpreter on a limited basis for staff meetings and further classroom instruction would not effectively eliminate

an essential job function.  Viewing the evidence in the light most favorable to Keith, a reasonable jury could find that providing an ASL interpreter during staff meetings and further classroom instruction is objectively reasonable.  And because Oakland County has not argued, much less conclusively shown, that providing the accommodation would impose an undue hardship on the operation of its business, summary judgment was inappropriate.  *See* 42 U.S.C. § 12111(10) (defining "undue hardship").

## D.  Interactive Process

Finally, we turn to the ADA's requirement that an employer engage in the interactive process.   The duty to engage in the interactive process with a disabled employee is mandatory and "requires communication and good-faith exploration of possible accommodations." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007); *see also* 29 C.F.R. § 1630.2(o)(3).  "The purpose of this process is to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'"  *Kleiber*, 485 F.3d at 871 (quoting 29 C.F.R. § 1630.2(o)(3)).

Keith argues that Oakland County failed to contact or otherwise interact with him before revoking the offer of employment, despite its knowledge that his deafness would require accommodation.  According to Keith, had Oakland County engaged in the interactive process, it would have learned that Keith can detect loud noises through his cochlear implant if he wears an external sound transmitter while on duty, which may have alleviated some of its concerns.  In addition, had Oakland County communicated with Keith, he could have referred Oakland County to various individuals with expertise regarding the ability of deaf individuals to work as lifeguards, which may have dispelled unfounded fears and resulted in a more informed decision.  Finally, Keith could have clarified his limited need for an ASL interpreter during staff meetings and further classroom instruction.  Essentially, Keith complains that Oakland County failed to give him a fair opportunity to respond to the concerns surrounding his employment.

The district court did not reach the merits of this argument because "[t]he Sixth Circuit follows the view that a failure to engage in the interactive process is not an

independent violation of the ADA." *Citing Bretfielder v. Leis*, 151 F. App'x 379, 386 (6th Cir. 2005). The plaintiff must show that a reasonable accommodation was possible. *Id.* According to the district court, because Keith failed, as a matter of law, to propose an accommodation that was objectively reasonable, any failure by Oakland County to engage in the interactive process did not constitute a violation of the ADA. This conclusion is erroneous because it rests on an incorrect premise. Because we conclude that Keith has met his burden to show that a reasonable accommodation was possible, at least sufficient to survive summary judgment, we ask the district court to address the merits of this argument on remand.

## IV.

For these reasons, genuine issues of material fact remain regarding whether Keith is otherwise qualified to be a lifeguard at Oakland County's wave pool, with or without reasonable accommodation. We therefore reverse the district court's grant of summary judgment in favor of Oakland County and remand for further proceedings consistent with this opinion. On remand, the district court is also directed to address whether Oakland County violated the ADA's individualized inquiry mandate by relying on the advice and opinions of third parties and failed to engage in the interactive process.