NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0608n.06

No. 12-1945

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Jun 27, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| RANDALL LOZAR, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| BIRDS EYE FOODS, INC., | ) | THE WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| Defendant-Appellee. | ) | |
| | ) | |

Before: DAUGHTREY, SUTTON, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. The plaintiffs in this case allege that Birds Eye Foods, Inc. contaminated the groundwater underneath their homes, causing personal injuries as well as injuries to their property. The district court granted summary judgment to Birds Eye on causation grounds. We affirm.

I.

The plaintiffs are more than 60 people who live near a fruit-processing plant owned by Birds Eye in Fennville, Michigan. The plant generates wastewater that Birds Eye sprays onto fields adjacent to the plant. In 2008, Birds Eye notified the plaintiffs that samples taken from the groundwater under the fields showed "slightly elevated levels of certain naturally occurring minerals and other substances," such as iron, manganese, and arsenic. Birds Eye also informed the plaintiffs that the groundwater may have migrated from the fields to their homes and contaminated the

plaintiffs' water wells. Birds Eye denied responsibility for any contamination, however, saying that its water came from the Fennville public water supply and that Birds Eye had not added any contaminants.

In January 2009, the plaintiffs filed this suit. Each plaintiff alleged that Birds Eye contaminated the groundwater beneath their homes because each lived "downgradient" from the spray fields, *i.e.* they lived in homes under which groundwater from the spray fields flowed. The plaintiffs claimed that, because of the contamination, they suffer a variety of physical ailments—such as heart disease, hair loss, skin rashes, joint pain, and swollen livers—and that their pets became sick. The plaintiffs also claimed that they suffer emotional distress.

In addition to personal and pet injuries, the plaintiffs claimed that the contamination caused toilets, sinks, showers, and other household plumbing fixtures to rust. The plaintiffs also claimed that their homes lost market value, that they are unable to sell their homes, and that the migration of contaminants from the spray fields to the groundwater under their homes constitutes trespassing. A few plaintiffs claimed that they lost an opportunity to sell their homes after potential buyers learned about the contamination. The plaintiffs also sought recovery for cleanup and remediation costs.

Soon after the plaintiffs filed their complaint, Birds Eye moved to dismiss the claims that sought recovery for cleanup and remediation costs. The district court found that the plaintiffs had failed to plead with specificity which plaintiffs incurred these costs, but gave the plaintiffs an opportunity to amend their complaint. The plaintiffs failed to do so by the court's deadline, so the court granted Birds Eye's motion.

The parties then conducted discovery. During discovery, the plaintiffs failed to file any reports from medical experts in support of their personal-injury claims. After the deadline passed to file these reports, Birds Eye moved for summary judgment on all personal-injury claims and all claims for injuries to pets. Before the court could rule on the motion, however, the plaintiffs voluntarily dismissed the personal-injury claims for all but three plaintiffs and all of the pet-related claims.

At the end of discovery, Birds Eye filed several motions. First, Birds Eye moved for summary judgment on the remaining personal-injury claims. The district court granted the motion, holding that the plaintiffs had failed to create a genuine issue as to whether Birds Eye caused their alleged physical injuries.

Birds Eye also moved for summary judgment on the Bustillos family's claims for emotional distress, the lost market value of their home, damage to their plumbing fixtures, the inability to sell their home, and trespass. The court granted the motion, holding that the Bustillos family had failed to create a genuine issue as to whether their groundwater was contaminated. In addition, Birds Eye moved for summary judgment on all of the plaintiffs' claims for lost market value of their homes. The court granted the motion, rejecting as unreliable the plaintiffs' expert opinion that the contamination had caused a decline in market value.

Birds Eye also moved for summary judgment on claims made by plaintiffs in over a dozen households for emotional distress, damage to plumbing fixtures, the inability to sell property, and trespass. The court held that the plaintiffs in these households had failed to create a genuine issue as to whether they lived downgradient from the spray fields. Thus, the court held, the plaintiffs had

not created a genuine issue as to whether Birds Eye caused their alleged injuries and granted Birds Eye's motion for summary judgment.

Birds Eye filed yet another motion for summary judgment, this time regarding the Lozar family's claim that they had lost an opportunity to sell their home because of the contamination. The court granted the motion, holding that the Lozars lacked evidence that a buyer had actually been ready to purchase the home. Birds Eye also moved to dismiss the emotional-distress claims of 16 plaintiffs. The court granted the motion in part, holding that five of these plaintiffs had withdrawn their emotional-distress claims, based on responses in their interrogatories, and that eight plaintiffs had failed to allege emotional distress in the complaint. But the court denied the motion in part, holding that the remaining plaintiffs had sufficiently pleaded emotional distress.

Thereafter, the remaining plaintiffs voluntarily dismissed their claims against Birds Eye. The plaintiffs now appeal several, but not all, of the district court's orders granting summary judgment to Birds Eye. Specifically, the plaintiffs appeal summary judgment as to two of the Bustillos family's claims, all of the plaintiffs' claims for lost market value, all claims for plaintiffs in six of the homes found to be outside of the downgradient area, and the Lozar family's claim for a lost opportunity to sell their home. The plaintiffs have abandoned their remaining claims, including their claims for personal injury, injuries to pets, cleanup and remediation costs, and trespass.

## II.

We review de novo a district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. *Keith v. City of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013).

On all of the claims at issue in this appeal, the district court granted summary judgment to Birds Eye on causation grounds. All of these claims are either negligence or nuisance claims under Michigan law. To prove either type of claim, a plaintiff must show that the defendant caused their alleged injuries. *See Haliw v. City of Sterling Heights*, 464 Mich. 297, 309–10 (2001) (elements of a negligence action); *Capitol Props. Group, LLC v. 1247 Ctr. Street, LLC*, 283 Mich. App. 422, 431–32 (2009) (elements of a nuisance action). We therefore review each claim presented in this appeal to determine whether the plaintiffs raised a genuine issue of material fact that Birds Eye caused the plaintiffs' alleged injuries.

## A.

The Bustillos family argues that the district court erred by granting summary judgment to Birds Eye as to the family's claims for damage to their plumbing fixtures and the lost market value of their home. The district court held that the family failed to create a genuine issue of material fact that Birds Eye caused their alleged injuries because the family had failed to show that their water was ever contaminated.

The Bustillos family admits that no tests showed that their groundwater was contaminated. Birds Eye tested the family's groundwater in 2008 and found no contaminant levels above the state's drinking-water standards. The family's expert tested the groundwater in 2010 and found the same. After reviewing this evidence, the district court noted that the family had expressly alleged that all of their injuries were caused by "exposure to the contaminated groundwater." 3d Am. Comp. ¶¶ 100–08. Thus, the district court determined, the Bustillos family could not establish causation for any of their claims without first showing that their groundwater was contaminated.

On appeal, the Bustillos family does not dispute that, to survive summary judgment, they must show that their groundwater had contaminant levels above drinking-water standards. Rather, they argue that, despite the test results, there remains a genuine issue as to whether their groundwater was contaminated. In support, the family contends that they live downgradient from the spray fields. But the plaintiffs' expert on this issue said only that downgradient homes "could be" affected by contaminated groundwater from the spray fields, not that the homes, more likely than not, were in fact affected. The Bustillos family also asserts that the iron level in their groundwater increased from .02 mg/L to .26 mg/L between 2008 and 2010. But that level does not exceed the applicable drinking water standards, and the Bustillos family otherwise offers no evidence that the iron level in their water could have caused their alleged injuries. The family has therefore failed to create a genuine issue of material fact that Birds Eye caused their injuries.

B.

All of the plaintiffs argue that the district court erred by granting summary judgment to Birds Eye as to the plaintiffs' claims for the lost market value of their homes. The district court held that the plaintiffs failed to create a genuine issue as to whether the contaminated groundwater caused their homes to lose value.

The plaintiffs relied on a report and testimony from real-estate expert Mark Sheppell to show that the contaminated groundwater caused all of their homes to lose value. The district court determined, however, that Sheppell's opinion was unreliable because it was unsupported by his data. Sheppell's opinion was the only evidence that the contamination caused the lost value, so the court determined that the plaintiffs again could not establish causation for any of these claims.

An expert's opinion must be reliable to be admissible. *See In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529–30 (6th Cir. 2008). To be reliable, the opinion must not have "too great an analytical gap" between the expert's conclusion, on the one hand, and the data that allegedly supports it, on the other. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 675–76 (6th Cir. 2010) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Here, Sheppell conducted a "mass appraisal" of Fenville homes by analyzing sales data for homes in the area. He noted that the average sale price for downgradient homes dropped 45% between 2007 and 2010. Based on this data, he concluded that each of the plaintiffs' homes had lost 45% of its value. He acknowledged that the economic downturn during that period caused a portion of the loss, but he attributed over half of the loss to Birds Eye, concluding that the stigma of contamination lowered the demand for the homes.

Sheppell's data also showed, however, that the average sale price for homes that were not in the downgradient area—and therefore not affected by the stigma of contamination—declined *more* than 45%. Sheppell acknowledged that this data conflicted with his opinion, but noted that downgradient homes remained on the market an average of 28 days longer than homes outside of the downgradient area. Sheppell did not, however, explain how this disparity translates to a quantifiable amount of lost market value. Sheppell's data therefore does not support his opinion, which makes the opinion unreliable. Thus, the plaintiffs lack reliable evidence linking market value to contamination, which means they have failed to create a genuine issue as to whether Birds Eye caused their homes to lose market value.

C.

Plaintiffs from six households argue that the district court erred by granting summary judgment to Birds Eye as to those plaintiffs' claims for emotional distress, damage to their plumbing fixtures, and the inability to sell their home. These plaintiffs do not dispute that summary judgment as to their claims is appropriate if their homes are located outside of the downgradient area. Rather, they argue that whether they lived within the boundaries remains a genuine issue of material fact.

During discovery, hydrogeologist experts for Birds Eye introduced a map depicting the boundaries of the downgradient area in Fennville. The map showed that these plaintiffs' homes were outside those boundaries. The plaintiffs' own hydrogeologist expert did not propose an alternative map. Instead, he agreed that Birds Eye's map was "reasonably accurate."

After this admission, Birds Eye filed a motion for summary judgment as to all claims for plaintiffs living in homes outside of the downgradient area. In response, the plaintiffs filed a declaration from their expert purportedly updating his opinion. The expert said that, based on further analysis, "it was not unreasonable to conclude that" the downgradient area extended beyond the boundaries shown in Birds Eye's map. The expert's declaration is not, however, definitive that the downgradient area is in fact larger than what is shown on the Birds Eye map. The declaration therefore is not a sufficient basis for a jury to find, by a preponderance, that the homes of these plaintiffs fell within the downgradient area. *See Wooler v. Hickman Cnty.*, 377 F. App'x 502, 507 (6th Cir. 2010) (expert testimony "was equivocal at best" and therefore insufficient "to avoid summary judgment on causation grounds"). These plaintiffs have therefore not created a genuine issue of material fact that Birds Eye caused their alleged injuries.

D.

Finally, the Lozar family argues that the district court erred by granting summary judgment as to their claim that they lost an opportunity to sell their home after a potential buyer heard about the alleged contamination.

To prove a lost opportunity to sell their home, the Lozars must show that they had an actual or prospective buyer. *See Green v. Townbridge 1, Inc.*, 2003 WL 21508489, at *4 (Mich. Ct. App. July 1, 2003). A prospective buyer is ready, willing, and able to buy the property at a set price; otherwise the lost opportunity to sell is too speculative to support recovery. *See id.*; *cf. Joerger v. Gordon Food Serv., Inc.*, 568 N.W.2d 365, 369 (Mich. Ct. App. 1997).

The Lozar family's only evidence that they had such a buyer was testimony from their realtor, Laura Durham. She said that a person had contacted her to buy the Lozars' home. She could not recall the person's name and admitted that the buyer did not make an offer. She directed the buyer to a mortgage company to determine whether he qualified for a loan, and later learned that he did. According to Durham, the buyer lost interest once he heard that the Lozars' groundwater was contaminated.

The district court ruled that Durham's testimony was inadmissible hearsay. Regardless of its admissibility, however, her testimony shows that the potential sale was too speculative to support the Lozars' claim. The buyer never made an offer; and the Lozars admitted that, without one, they do not know whether they would have sold their home to this buyer. Thus, the Lozars cannot show that they lost an opportunity to sell their home.

The district court's judgment is affirmed.