NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0575n.06
Case No. 16-5080

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Oct 21, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KENNETH W. CAMP, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| BI-LO, LLC, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| _____/ | ) | |

**Before: MERRITT, ROGERS, and KETHLEDGE, Circuit Judges.**

**MERRITT, Circuit Judge.** Plaintiff Kenneth Camp appeals the district court's decision granting summary judgment to his employer, defendant Bi-Lo, LLC, on his claims that he was discriminated against on the basis of his disability and unlawfully dismissed in violation of the Americans with Disabilities Act, the Age Discrimination in Employment Act, and Tennessee law. Camp claims that Bi-Lo failed to accommodate his back impairment and discharged him from his position as a stock clerk in violation of the Americans with Disabilities Act. As the district court recognized, the crux of this case is whether the ability to lift more than 35 pounds is an "essential function" of Camp's job as a grocery store stock clerk, and, if so, whether Camp could perform this essential function with or without reasonable accommodation. Because Camp performed his job for years with his back impairment without incident or complaint from his

employer, we find that there are disputed issues of fact as to whether the ability to lift more than 35 pounds is in fact an "essential function" of his grocery store clerk job and whether Camp's disability could have been reasonably accommodated by Bi-Lo. We therefore vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

## I. Facts

Plaintiff Kenneth Camp worked for 38 years for defendant Bi-Lo grocery store, or its predecessors, as a stock clerk. In March 2012, Camp was employed on the overnight third shift in one of Bi-Lo's stores in Chattanooga, Tennessee. He was one of three people, along with Jimmy Bishop and Kent Kountz, who worked as a team to stock the grocery with product each night. Bishop was "head stock clerk" and Camp's immediate supervisor, and Kountz was a stock clerk along with Camp. All three men worked to unload stock from pallets and put it on store shelves.

On one occasion, somewhere around March 2012, Calvin Gilreath, the Store Director, arrived at the store at the end of the third shift and found that the three third-shift stock clerks had not finished shelving all of the product. When Gilreath asked why, Bishop, the supervisor for the third shift, told him that Camp had a "bad back" and they "had to help with the heavy stuff to get it done." Camp Dep. at 34-35. Gilreath testified that Bishop told him "it was hard for them to get done with [Camp] on restrictions." Gilreath Dep. at 18. Camp has suffered from scoliosis since he was a teenager, and he had worked with his bad back since that time. Gilreath was not aware that Camp suffered from a bad back prior to this occasion. Gilreath was not aware of any other time the third-shift crew had failed to finish on time. Gilreath Dep. at 40, 52.

After this exchange, Gilreath told Camp that Bi-Lo was "thinking of putting you on light duty." Camp Dep. at 35. About two weeks later, in April 2012, Camp met with Bi-Lo's Human

Resources Specialist, Ray Kessler. Kessler asked Camp if he could perform his duties, to which Camp replied "Yes, I can still do everything. I know what I can lift and what I can't, and I can do all the other things except lift the real super heavy items." Camp Dep. at 42. Camp was given the stock clerk job description and a physical capabilities testing sheet to have completed by a physician. The job description, created in 2007, more than 30 years after Camp began his employment with Bi-Lo, identifies "lifting" as one of the physical demands of the stock clerk position. It states that a stock clerk must be able to lift at least 20 pounds "constantly" and 20-60 pounds "frequently." A doctor concluded that Camp was capable of lifting 20 pounds frequently and less than 10 pounds constantly, but capped the weight he could safely lift at 35 pounds. On April 24, 2012, Camp met with Kessler and Gilreath. Camp testified that they told him that "the good news is you're not terminated. . . . The bad news is you're going to have to take a leave of absence." Camp Dep. at 49. Camp was instructed to take the remainder of his sick leave and vacation days (slightly less than four weeks combined), followed by short-term disability, in order to reach his sixty-second birthday when he could begin to "start drawing Social Security and start getting your retirement check." *Id*.

Camp requested to return to work after his short-term disability ended, but Human Resources Specialist Kessler told him he could not return unless he had been cleared by a doctor to lift 60 pounds. Camp Dep. at 53. Camp's leave was extended several times while he exchanged letters with Bi-Lo. On September 27, 2012, Camp was informed he would be terminated on October 12, 2012, for "job abandonment" if he did not provide a "fitness for duty" form signed by his doctor. Camp requested an accommodation that would allow returning to work under the same arrangement as before where his two coworkers lifted the heaviest items.

Letter dated Oct. 12, 2012, from Camp's counsel to Bi-Lo.[1]  Bi-Lo refused Camp's request.

Camp did not provide the required form and was terminated from his position at Bi-Lo as a stock

clerk effective October 12, 2012.  Bi-Lo sent a letter to Camp's counsel stating that "[b]ased on

Mr. Camp's documented restrictions, he was unable to fulfill the physical demands of the Stock

Clerk's position because the job description required the frequent carrying and lifting of product

weighing between 20 and 60 pounds."  Letter dated Oct. 12, 2012.  After receiving a right-to-sue

letter from the Equal Employment Opportunity Commission, Camp filed suit against Bi-Lo

under the Americans with Disabilities Act, 41 U.S.C. § 1201 *et seq.*, the Tennessee Disability

Act, Tenn. Code Ann. § 8-50-103, the Age Discrimination in Employment Act, 29 U.S.C. § 621

*et seq.*, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-102 *et seq*.  The parties

agreed to have the case decided by a magistrate judge.  The magistrate judge granted summary

judgment to Bi-Lo because he found that the job description required that Camp be able to lift

more than 35 pounds and it was therefore an "essential function" of the job.  Because Camp

could not perform this function, he was not "qualified" for the position and his discharge did not

violate the Americans with Disabilities Act  Mem. and Order at 11.  Camp now appeals the

dismissal of his federal disability and age discrimination claims only.  The state claims have been

abandoned.

## II.  Discussion

### A. The Americans with Disabilities Act

We review the district court's grant of summary judgment *de novo*.  *Miller v. Sanilac

Cty.*, 606 F.3d 240, 246 (6th Cir. 2010).  Summary judgment is proper when there is no genuine

issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.

---

[1] Bi-Lo also informed Camp that it did not have any "light-duty" jobs available for Camp.  Camp does not argue that Bi-Lo should have given him a permanent light-duty position as an accommodation and this is not an issue in this case.

R. Civ. P. 56. We make all reasonable factual inferences in favor of the nonmoving party and uphold a grant of summary judgment only where the record as a whole could not lead a rational trier of fact to find for the nonmoving party.

Camp alleged that Bi-Lo discriminated against him based on his disability in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*. The Act prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id*. § 12112(a). Impermissible discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id*. § 12112(b)(5)(A). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id*. § 12111(8). Thus, if an individual's disability renders him unable to perform an "essential function" of his job, he is not a "qualified individual" protected by the nondiscrimination provision of section 12112. *See id*. In such an instance, the Act does not require an employer to continue employing the disabled employee, nor does it require the employer to offer that employee an accommodation. *See id*. §§ 12111–12.

Here, it is undisputed that Camp was "disabled" and that he was discharged, leaving only the question of whether he was "qualified" to perform the essential functions of his job with or without accommodation. The district court found that Camp was not "qualified" for the stock

clerk position because he could not perform an "essential function" of the job: the ability to lift more than 35 pounds. The district court went on to find that Bi-Lo was not required to accommodate Camp by reassigning an essential function to another employee. Mem. and Order at 10-11.

Bi-Lo violated the Act only if Camp is a "qualified individual" according to section 12111(8). The parties agree that Camp cannot lift more than 35 pounds as required by the job description, but Bi-Lo does not otherwise dispute Camp's ability to work as a stock clerk. Therefore, whether Camp is a "qualified individual" subject to the Act's protection, and whether Bi-Lo violated the Act, depends entirely on whether it is undisputed that the ability to lift more than 35 pounds is an "essential function" of the stock clerk position for the purposes of section 12111(8).

### 1. "Essential Function"

The Act identifies two factors that inform whether a particular function is essential to a position. The statute provides in relevant part:

> consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). The federal regulations implementing and interpreting the Act explain what constitutes an "essential function," and includes a nonexhaustive list of nondispositive factors to consider as evidence of whether a particular function is essential. "Factors to consider when determining whether a job function is essential to the position include: (1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar

jobs." *Keith v. Cty. of Oakland*, 703 F.3d 918, 925-26 (6th Cir. 2013); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 762 (6th Cir. 2015) (en banc) (applying the regulatory factors to determine if a particular work function was essential); 29 C.F.R. § 1630.2(n).[2] "Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment," *Keith*, 703 F.3d at 926 (citation omitted), but summary judgment may nonetheless be proper where a court conclusively determines that there is no genuine issue as to any material fact and thus that no reasonable jury could find for the nonmoving party.

---

[2] (n) Essential functions—

(1) In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs

29 C.F.R. § 1630.2(n).

Unsurprisingly, Bi-Lo maintains that the ability to lift more than 35 pounds is an essential function of the stock clerk position. In advancing the importance of the ability to lift more than 35 pounds, Bi-Lo has relied chiefly on a written job description for the stock clerk position and the opinion of Ray Kessler, its Human Resources Specialist, who opined that heavy lifting was an essential function. However, Kessler's judgment comes solely from the written job description, which he acknowledges he was not involved in creating. He stated he had never observed Camp work and he had not talked with Camp or Camp's coworkers about Camp's job performance. Kessler Dep. at 40-41. We also note that the job description is dated May 26, 2007, many years after Camp began his employment in 1974. There is no evidence in the record of what the job description was for "stock clerk" in 1974 when Camp was first hired. Camp and his two coworkers on the third shift testified that they had never seen a job description for stock clerk before this litigation. It appears that Bi-Lo looked only to the job description to render its opinion that heavy lifting was an "essential function" of the stock clerk position.

Camp points to the testimony of his immediate supervisor, Bishop, to rebut Bi-Lo's heavy reliance on the written job description. Bishop testified that "heavy lifting was not an essential function of Mr. Camp's job, and Mr. Camp did his job fine." Bishop Decl. ¶ 2. In a similar situation, we have held that a supervisor's testimony may rebut the written job description concerning what constitutes an essential function of a job. *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014) (finding that not every member of the firefighting crew needed to be able to drive the emergency vehicles) (citing *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1258 (11th Cir. 2007)).

In addition, Bi-Lo has not submitted evidence outside of the job description that demonstrates that heavy lifting is a significant percentage of the job requirement or that Camp's

inability to lift more than 35 pounds has been an actual burden on Bi-Lo. According to Camp's supervisor, "Heavy lifting . . . was only a very small part of the work done by the third shift stock crew." Bishop Decl. ¶ 3. Camp's other coworker also testified that "the stock that Mr. Camp could not lift was only a very small part of the total stock." Kountz Decl. ¶ 5. Camp and his coworkers also testified that Camp could be working on putting items on the shelves while the other two men carried the heavier items, so that there was no loss in efficiency due to Camp's disability. Bishop Decl. ¶ 3 ("[W]hen there was some heavy lifting to be done, we [Camp's two coworkers] were easily able to accommodate Mr. Camp's back problems by allowing him to do work that did not require heavy lifting while we did the heavy lifting."). Thus, all of the people who worked closely with Camp on a daily basis agreed that heavy lifting was not an important part of the job.

The regulations also instruct us to consider the consequences of Camp not performing the heavy lifting. Because Camp and his coworkers had worked out an arrangement where Camp did not lift the heaviest items, the consequences of Camp not performing some of the required work fell to them. Camp had worked on the same three-man team to stock the shelves during the third shift for a substantial period of time prior to the one morning when the team failed to get all the product on the shelves before the end of their shift. The two other men on the third shift, one of them Camp's immediate supervisor, testified that allowing Camp to continue as stock clerk without the ability to lift more than 35 pounds would have minimal effect on store operations. They both testified that they can, and have been, lifting the heaviest items when stocking the store shelves for a long time. Camp's supervisor testified that "heavy lifting was not an essential function of Mr. Camp's job, and Mr. Camp did his job fine." Bishop Decl. ¶ 2. The other stock clerk on the team corroborated the supervisor's testimony. Kountz Decl. ¶ 5 ("[H]eavy lifting

was not an essential function of Mr. Camp's job.). By working together, the three-man team had in all but the one incident that triggered this action been able to shelve all of the product during the designated shift. No additional stock clerks have been requested or needed to work the third shift. In other words, any consequences resulting from Camp's disability are *de minimis*. *See Rorrer*, 743 F.3d at 1034 (each shift crew in the firehouse decided on a daily basis who would do what positions and some firefighters never drove emergency vehicles "as a matter of choice").

This is not a case involving a firefighter, nurse, police officer or a military person where the inability to lift the "required" weight could put an innocent person's life at risk or cause "undue hardship" on or even endanger a colleague. *See Adair v. City of Muskogee*, 823 F.3d 1297, 1309 (10th Cir. 2016) (noting that the federal regulations concerning what constitutes an "essential function" mention the dire consequences of a firefighter being unable to perform essential functions of the job: "[A]lthough a firefighter may not regularly have to carry an unconscious adult out of a burning building, the consequence of failing to require the firefighter to be able to perform this function would be serious." 29 C.F.R. app. § 1630.) This is far from that scenario. This is three men who worked the night shift together at a grocery store and agreed to help each other out.

The list of factors in the regulations is nonexclusive and nondispositive, so we may consider other factors. In this case we also must take into consideration that Camp fulfilled the duties of the job for years with his disability and the help of his coworkers. We do not "require blind deference to the employer's stated judgment" that the ability to lift more than 35 pounds is an essential function when ruling on a motion for summary judgment. The record contains facts that might allow a reasonable jury to discount Bi-Lo's reliance on the written job description as it relates to the necessity of the stock clerk lifting more than 35 pounds. In particular, Camp's

actual on-the-job experience, and that of his coworkers, including his immediate supervisor, provide evidence to rebut Bi-Lo's contention that heavy lifting is in fact an "essential function" of the stock clerk job.

There is substantial evidence that Camp was performing his job under an informal arrangement with his coworkers until the day that Store Director Gilreath asked about Camp's bad back. Such informal accommodation should be considered in a positive light.[3] Upon learning of Camp's disability and the informal accommodations, Gilreath refused to allow them to continue and removed Camp from his job. It is true that a reasonable jury might conclude that Gilreath's conduct was justified, particularly once he had received the doctor's report opining that Camp should not lift more than 35 pounds, but Camp is entitled to have a jury weigh the conflicting evidence, not the court. We therefore find that it is not undisputed that the ability to lift more than 35 pounds is an essential function of the stock clerk job.

## 2. **Reasonable Accommodation**

A claim for failure to accommodate requires a plaintiff to show that he was both disabled and able to perform the essential functions of his job despite the disability either with or without reasonable accommodations. Further, a plaintiff must prove that her employer was aware of her disability and denied specific, reasonable accommodations. "Once the plaintiff has established a prima facie case, 'the burden shifts to the defendant to show that accommodating the plaintiff would impose an undue hardship on the operation of its business.'" *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014) (quoting *Keith v. Cty. of Oakland,* 703 F.3d 918, 923 (6th Cir. 2013)). As the magistrate judge explained in his Memorandum and Order, the issue of

---

[3] When the employee has affirmatively requested accommodation, the scope of the employer's obligation in this regard is determined through an "informal, interactive process" between the employer and the employee, identifying the limitations arising from the disability and potential reasonable accommodations that could overcome those limitations. 29 C.F.R. § 1630.2(o) (3)).

whether Camp was a "qualified individual" was "intertwined" with the accommodation issue because the consequences to Bi-Lo of Camp's inability to lift more than 35 pounds under the "essential function" analysis relates to the determination of whether a reasonable accommodation would cause undue hardship on Camp's coworkers and store operations.

In examining whether Camp should have been granted his requested accommodation to continue working under the informal arrangement he and his two coworkers had devised, we first note that the record demonstrates that Camp was generally meeting all job expectations. His termination seems to stem from one incident where all the stock did not get put up during the third shift. Bi-Lo does not cite to any other examples where Camp's inability to lift more than 35 pounds caused or contributed to delay in restocking the store shelves. The record does not show that plaintiff was failing to show up for work and his colleagues were covering for his absences or that the third-shift workers regularly failed to complete their task by the end of the shift. As Camp had been doing the stock clerk job for a number of years without lifting the heaviest items, the lack of evidence on the part of Bi-Lo to show that the informal accommodation has been a problem is significant. Enough time has passed for any negative impact to be felt by Bi-Lo and for it to present additional evidence outside of the one incident that triggered this action.

Bi-Lo has presented no evidence that accommodating Camp's disability caused undue hardship to his coworkers. To the contrary, both Bishop and Kountz testified that it was not a problem to assign the work among themselves in a way that allowed them to get it all done. His supervisor specifically noted that Camp's inability to do heavy lifting did not create hardship on his coworkers "because there was always other work [that] Mr. Camp could do and [that] needed to be done while someone else was lifting the heaviest things." Bishop Decl. ¶ 3. Bi-Lo has not

submitted evidence to rebut this testimony or to show hardship to other employees or the store's business. The disability has been informally, and apparently successfully, accommodated by the three-man team without negatively impacting store operations. A reasonable jury could find that the informal accommodation made by the three employees working the third shift was a reasonable response to one requirement of the stock clerk position. Camp asked only to work as he has worked successfully for years without evidence of hardship to his coworkers or employer. So, even if the ability to lift more than 35 pounds was an essential function, there is evidence that Camp is qualified for the stock clerk position with accommodation, and that reasonable accommodation of the disability is possible without undue hardship to coworkers or disruption of business operations.[4]

### B. The Age Discrimination in Employment Act

Although the parties gave short shrift to Camp's age discrimination claim on appeal, we will briefly address the claim. The district court dismissed Camp's age discrimination claim on the same ground as the dismissal of his disability claim—the determination that Camp was not "qualified" for the stock clerk position. Because we find that there is a disputed issue of fact as to whether Camp is "qualified," we vacate summary judgment on this claim as well for the reasons outlined above.

To establish a prima facie case of age discrimination, a plaintiff must show: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse

---

[4]The dissent claims that Bi-Lo should not have been forced to keep Camp as an employee "once the disability is discovered to interfere with operations." Perhaps a jury will take that position, but there is a dispute of fact as to whether Camp's disability interfered with store operations. The so-called "interference with operations" was one incident—clearly *de minimis* when viewed in light of Camp's 38-year career with Bi-Lo. This is also not a case where Bi-Lo declined to *hire* a stock clerk who could not meet the requirements of the job description. The charge is that Bi-Lo failed to even consider a reasonable accommodation for a long-time stock clerk who had no knowledge of any lifting requirements for 38 years and where Bi-Lo has presented no evidence that heavy lifting was a requirement for the job in 1974 when Camp was hired.

employment action; and (4) circumstances that support an inference of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002); *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2014). Camp has submitted evidence that he is in the protected group as he was 61 at the time of his discharge, that he is qualified for the stock clerk position with or without reasonable accommodation, and that he was discharged under circumstances that support an inference of discrimination. Specifically, Camp submitted evidence that when Bi-Lo put him on leave in April 2012, he was instructed to take the remainder of his sick leave and vacation days, followed by short-term disability, in order to reach his sixty-second birthday when he could begin to "start drawing Social Security and start getting your retirement check." Camp Dep. at 49. A jury could infer from this statement that Bi-Lo dismissed Camp because his age allowed him to draw social security benefits, thereby arguably softening the financial impact of his dismissal. Also, the person who replaced Camp was "significantly younger." Bishop Decl. ¶ 8.

Because Camp has submitted evidence of age discrimination and we find that there are factual disputes as to whether he is "qualified" with or without accommodation, summary judgment on Camp's age discrimination claim was improper.

For the foregoing reasons, the judgment of the district court is vacated and the case remanded for further proceedings consistent with this opinion.

**ROGERS**, Circuit Judge, dissenting.

It is hard to see what Bi-Lo may have done wrong here. Letting workers informally cover for a fellow worker's disability, without knowledge of the disability, cannot be bad. It certainly should not serve as a basis for forcing an employer to continue such an accommodation once the disability is discovered to interfere with operations. The fact that the employee's fellow crew-members later testified that "[t]he stock that Mr. Camp could not lift was only a very small part of the total stock" should not preclude Bi-Lo from fairly ascertaining Camp's physical limits, and comparing those limits with the physical requirements of the stock person's job.

The company did so. An examining physician determined that Camp was able to lift 10 pounds on a constant basis, 20 pounds on a frequent basis, and a maximum of 35 pounds. Whatever Bi-Lo previously allowed, it could not then as a practical matter require Camp to exceed those limits. Even without a written job description it has to be reasonable for a grocery store to decline to hire a stock clerk with such physical limitations, where the very job largely consists of moving stock. But in this case there was a pre-existing written lifting requirement for the job—"frequent" lifting, pushing, and pulling of 20-60 pounds, as well as "occasional" pushing of over 60 pounds. There is no indication that the lifting requirement was determined after Camp's disability was disclosed, and the fact that employees were not aware of the determined physical job requirements does not in any way suggest that Bi-Lo did not objectively determine the requirements.

Accordingly, I would affirm for the reasons given in the thoughtful opinion of the district court.